POLEN, J.
Appellant, Main Street Management Services, Inc., appeals a final judgment awarding Appellee, Eight Sixty South Ocean Boulevard, Inc., $500,000 in liquidated damages for an alleged breach of a contract for sale and purchase of real property and denying Main Street’s claim for return of its deposit under the contract. This court has jurisdiction. Fla. R.App. P. 9.030(b)(1)(A).
Eight Sixty South (as seller) and Main Street (as purchaser) entered into a standard FAR/BAR[1] Contract for Sale and Purchase of real property located at 860 South Ocean Boulevard, Palm Beach, Florida. The purchase price was $18,250,000. Main Street deposited $250,000 in escrow upon signing the contract and agreed to deposit another $250,000 in escrow within three days of the end of the inspection period. The contract’s effective date was February 7, 2006.
Standard N of the FAR/BAR Contract governs, among other things, a seller’s contractual warranties as to certain defects, a buyer’s right to inspect the property and request that certain repairs be made, and a seller’s repair obligations. Pursuant to Standard N, within twenty days of the contract’s effective date, a buyer may inspect the property and provide written notice to the seller of any items that do not meet the contractual standards as to defects (“repair notice”). If any of the items in the buyer’s repair notice are required to be made in order to comply with the seller’s warranties as to defects, the seller is obligated to make such repairs/replacements up to three percent of the purchase price of the property. However, if the repairs requested exceed the three percent ceiling, buyer or seller may elect to pay the excess, failing which either party may cancel the contract. In addition, if the seller is obligated or has opted to make the repairs and is unable to make the repairs prior to closing, the seller must place the cost of the repairs into escrow. Finally, under Standard N, seller is required to provide access to the property for inspections upon reasonable notice.
As part of the contract, the parties also executed two addenda. The first addendum to the contract created a “Due Diligence Period” and a “Contingency Period.” The Due Diligence period shortened the inspection period allowed for by Standard N from twenty to fifteen days from the effective date of the contract. The Contingency Period ended fifteen days after the end of the Due Diligence period and allowed the buyer to terminate the contract if the purchaser of another property a Main Street affiliate was selling terminated that deal.
The contract’s effective date was February 7, 2006. On February 22, Main Street timely provided its repair notice to 860 South in the form of a letter and attached reports. The letter listed the necessary repairs totaling over $900,000, an amount that exceeded the three percent ceiling provided in Standard N of the contract. The letter also stated that, because of the exorbitant cost of the necessary repairs, Main Street elected to cancel the contract unless 860 South immediately notified Main Street of its intent to make all of the listed repairs. On February 23, 860 South sent a letter to Main Street via facsimile stating that it would “promptly engage professionals to evaluate the mold issues and the itemized repairs requiring construction work.” The letter also stated that, at that time, Main Street did not have the right to terminate the contract under Standard N because 860 South had not *1157 made its election as to whether it would make the repairs that exceeded the three percent ceiling.
Main Street sent a letter via facsimile acknowledging its receipt of the February 23 letter and stating its understanding that the ongoing inspections would toll “any underlying timeframes in the contract until such time as Seller makes the appropriate elections.” On March 6, 860 South replied via facsimile explaining, “the timing of Seller’s election shall not change or extend any of the existing contractual deadlines or the Closing Date.” On March 7, Main Street replied via facsimile and declared that it disagreed with 860 South’s definition of tolling and maintained that all contractual deadlines were tolled until inspections were completed and 860 South made its election.
March 9 marked the end of the contingency period within which Main Street was permitted to terminate the contract if the sale of property by a Main Street affiliate was terminated. On March 10, Main Street sent notice via facsimile that the sale of their other property had been can-celled and that it was exercising its right to terminate pursuant to the contingency clause.
Eight Sixty South wrote to a general contractor and requested that his company oversee and begin repairs on the property and informed him that the repairs needed to be completed by Friday, April 7 just prior to the scheduled April 10 closing. Eight Sixty South hired several companies to complete repairs to the property. The President of 860 South believed the company spent between $70,000 and $100,000 on repair work. Counsel for 860 South estimated the work to have cost nearly $200,000. The closing statement revealed “unpaid” repair bills of $193,678.48. Finally, the parties disagreed as to whether the building required an entirely new roof at an estimated cost of $365,000. Eight Sixty South was unable to find a roofing company to complete the work by closing, and so it came to closing with a check for $365,000 to place into escrow for roof repairs.
The closing was never consummated. Main Street brought an action to recover its deposit of $250,000. Eight Sixty South counterclaimed seeking declaratory judgment and damages for Main Street’s breach of contract.
The trial court found, following a nonju-ry trial, that the March 9 deadline had never been tolled, and thus, that Main Street’s attempt to terminate the contract on March 10 was ineffective. Also, the court determined that the contract provisions regarding inspection rights and repair obligations did not support Main Street’s argument that there was an implied term requiring 860 South to inform Main Street of its elections before its right to terminate expired. The court entered a final judgment allowing 860 South to retain the $250,000 deposit, awarding 860 South an additional $250,000 in liquidated damages, and denying Main Street’s claim for return of its deposit.
Main Street argues on appeal that 860 South violated the implied covenant of good faith and fair dealing by failing to notify Main Street of its repair elections prior to the expiration of Main Street’s right to terminate the contract and that the trial court erred in finding otherwise. In Ament v. One Las Olas, Ltd., this court explained that the implied covenant of good faith and fair dealing must apply to the performance of an express contractual term. 898 So.2d 147, 149 (Fla. 4th DCA 2005). In the present case, there was no express term in the contract that required 860 South to notify Main Street of its repair elections, and so there could not have been a breach of the implied covenant *1158 of good faith and fair dealing for 860 South’s failure to do so.
Not only was 860 South not required by the contract to provide Main Street with notice of its repair elections, but the facts do not support a finding of bad faith. First, the record does not indicate that 860 South denied Main Street information about its repair elections upon inquiry by Main Street. In fact, there is no indication that Main Street ever asked 860 South about its elections. Second, 860 South completed extensive repair work on the property and came to the closing prepared to deposit $365,000 into an escrow account for roof repairs which had been impossible to complete by the closing date. On such facts, a claim for breach of the implied covenant of good faith and fair dealing would not lie.
As to the other arguments advanced by Main Street on appeal, we are unpersuaded.
Affirmed.
KLEIN and STEVENSON, JJ., concur.

. Florida Association of Realtors and The Florida Bar